UNITED STATES DISTRICT COURT FILED
SEP 28 2016
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

PANDORA DENESE WILLIAMS,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

**DECISION & ORDER**
15-CV-6136

## Preliminary Statement

Plaintiff Pandora Williams ("plaintiff") brings this action pursuant to Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income. See Docket # 1. Presently before the Court are the parties' competing motions for judgment on the pleadings. See Docket ## 10, 13.

## Background and Procedural History

On June 6, 2011, plaintiff applied for supplemental security income, alleging a disability onset date of August 31, 2007. Administrative Record ("AR") at 237. On August 25, 2011, the Social Security Administration denied her application. AR at 105-109. Plaintiff filed a timely request for a hearing by an administrative law judge ("ALJ"). AR at 113. On June 26,

2013, a hearing was held before ALJ Susan Wakshul. AR at 45-90. On July 3, 2013, the ALJ issued a decision finding plaintiff not disabled under the Social Security Act and denying her application for benefits. AR at 24-39. Plaintiff filed a request for review of the ALJ's decision by the Appeals Counsel and, on January 13, 2015, the Appeals Council denied her request, making the ALJ's decision the final decision of the Commissioner. AR at 1-4. This federal lawsuit followed.

**Relevant Evidence and Medical History**

In plaintiff's disability report, she alleged that she stopped working due to major depression, anxiety, insomnia, high blood pressure, arthritis, carpal tunnel syndrome, and bipolar disorder. AR at 242. While plaintiff alleges that her conditions became disabling on August 31, 2007, the relevant period in the instant suit for supplemental security income begins on June 6, 2011, the date of her application, and ends on July 3, 2013, the date the ALJ issued her decision. See 20 C.F.R. §§ 416.335, 416.501. The Court includes evidence outside this period merely for context. Additionally, because plaintiff's motion for judgment on the pleadings (Docket # 10) solely addresses concerns with the ALJ's findings as to plaintiff's mental impairments, the Court will not be addressing plaintiff's history of physical impairments.

Treatment at Culver Medical Group: Plaintiff began reporting psychiatric impairments on March 15, 2010. AR at 382. During a follow-up visit at the Culver Medical Group within the University of Rochester Medical Center, plaintiff reported feeling overwhelmed, depressed, and anxious. Id. She claimed to have difficulty concentrating and sleeping. Id. Dr. Elizabeth Cherella, M.D., prescribed plaintiff an anti-depressant and she was referred to mental health counseling for her depression and anxiety. AR at 382-83. On March 29, 2010, plaintiff returned, complaining of depression and anxiety. AR at 379. Though she claimed to feel better, she reported continued difficulty sleeping and felt overwhelmed. Id. Dr. Cherella increased plaintiff's anti-depressant prescription and advised her to continue with counseling. AR at 380. Dr. Bingemann noted on November 8 and November 22, 2010 that plaintiff appeared to be "doing quite well" with regard to her mood. AR at 370, 372.

On May 10, 2010, plaintiff was examined by Dr. Todd Bingemann, M.D. AR at 377. She reported that her depression and anxiety had improved, and Dr. Bingemann observed that she appeared hypomanic. AR at 377-78. On August 27, 2010, plaintiff appeared to be improving: she denied experiencing depression and Dr. Cherella advised her to continue with her treatment. AR at 375-76. On June 6, 2011, however, plaintiff

reported to Dr. Bingemann that she was "doing worse" and "crying often." AR at 367. She reported that she had stopped all treatment, and Dr. Bingemann advised plaintiff to continue attending weekly therapy sessions. AR at 368. She appeared slightly better on June 10, 2011, and Dr. Bingemann again advised plaintiff to continue with her therapy. AR at 364-65. On July 6, 2011, plaintiff reported difficulty sleeping and that she was hearing voices at night. AR at 362. She also reported suicidal ideations, and Dr. Cherella increased the dosage of her anti-depressant prescription. AR at 363.

Treatment at Unity Health System: Plaintiff later obtained mental health treatment at St. Mary's Mental Health Outpatient Clinic, part of Unity Health System. AR at 458-471. Plaintiff attended mental health therapy with Carolyn Gavett beginning on May 18, 2011. AR at 458. Gavett diagnosed plaintiff with bipolar disorder and assigned her a Global Assessment of Functioning ("GAF") score of 52.[1] Id. Plaintiff told Gavett that she cried easily and felt depressed. AR at 460. Upon examination, Gavett noted that plaintiff met the criteria for moderate, recurrent major depressive disorder. AR at 470. By June 6, 2011, plaintiff's mood had improved and she reported

---

[1] A GAF score of 51-60 suggests moderate symptoms or moderate difficulty in functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, IV 34 (1994).

that "things ha[d] been going well . . . ." AR at 448. On June 12, 2011, however, plaintiff appeared tearful and depressed when meeting with Gavett. AR at 443. On July 5, 2011, plaintiff appeared depressed and told Gavett that her depression had worsened. AR at 429. During this time, her GAF scored increased to 53. AR at 458-425.

In early October 2011, Gavett noted that plaintiff was doing better and "presented at baseline." AR at 640. However, by October 17, 2011, plaintiff again appeared depressed and tearful, and admitted that she had "not been using many coping skills." AR at 633. By February 27, 2012, plaintiff was "euthymic but irritated," and Gavett assigned her an increased GAF score of 56. AR at 616.

Gavett completed a psychiatric report on plaintiff's treatment on October 3, 2011, which was reviewed and co-signed by Dr. Muhammad Dawood, M.D. AR at 514-519. In the report, Gavett indicated that she began treating plaintiff on May 18, 2011 with weekly psychotherapy sessions and opined that plaintiff's condition could be expected to last twelve months or longer. AR at 514. She diagnosed plaintiff with bipolar disorder not otherwise specified and noted that plaintiff was impaired in mood and affect, memory, motor activity, concentration, thought and speech, and insight. AR at 514-515. According to Gavett, plaintiff was moderately restricted in

completing household chores, taking public transportation, sleeping, cooking, and showering or bathing. Id. Gavett opined that plaintiff had marked restrictions in social functioning, including in her ability to receive and carry out instructions, communicate, and receive constructive criticism. AR at 516. Gavett also opined that plaintiff had marked impairment in maintaining concentration, persistence, or pace. Id. For example, Gavett noted that plaintiff misplaced or lost items, took "longer to complete tasks due to racing and ruminating thoughts," and lost focus in therapy sessions. Id. She stated that, on several occasions, plaintiff appeared deteriorated or decompensated; she was tearful, distressed, irritable, and depressed. Id. Due to her condition, Gavett opined that plaintiff could not function independently outside of her home beyond attending medical appointments. AR at 517. Because she became "easily dysregulated in response to pressure or perceived criticism" and experienced "racing, tangential thoughts," Gavett believed that plaintiff was unable to carry out and remember instructions, respond appropriately to a supervisor or co-worker, or handle customary work pressures. Id. Gavett also noted that plaintiff's symptoms resulted "in [her] inability to maintain [a] consistent work schedule and function effectively in this setting." AR at 518. Accordingly, Gavett noted, and Dr. Dawood agreed, that plaintiff would be unable to perform her

past relevant work for eight hours per day, five days per week. Id.

She began attending medication management appointments with Dr. Muhammad Dawood, M.D., at Unity Healthy on December 20, 2011. AR at 625-632. At her first appointment, Dr. Dawood noted that plaintiff had been previously diagnosed with bipolar disorder and back pain. AR at 625. Although plaintiff complained of seasonal depression, she stated that she was "doing better" and Dr. Dawood noted that she appeared "calm, cooperative, alert, aware, [and] oriented x3." AR at 626. Dr. Dawood's treatment notes from April 2, 2012 again described plaintiff as "calm, cooperative, alert, aware, [and] oriented x3" and stated that her medication was decreasing her auditory hallucinations and improving her focus. AR at 609. By November 2, 2012, however, Dr. Dawood noted that plaintiff was "feeling sad and not doing well" and displayed symptoms of depression and isolation. AR at 583. He also indicated that plaintiff suffered from a "chronic condition." Id.

Plaintiff transitioned to mental health therapy with Tiffany Mancuso, a Licensed Mental Health Counselor at Unity Health, on May 7, 2012. AR at 604. Mancuso assigned plaintiff a GAF score of 60,[2] although she noted that plaintiff appeared

---

[2] A GAF score of 61-70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. American

"hypomanic per baseline." AR at 604-605. At the end of May 2012, plaintiff appeared anxious, tearful, and frustrated. AR at 600. While plaintiff appeared stable by August 2012, she still acted distressed and tearful. AR at 592. By the end of August, Mancuso assigned plaintiff a GAF score of 62. AR at 591. Although plaintiff complained of increased stress and appeared anxious, Mancuso increased plaintiff's GAF score to 64 in December 2012. AR at 575-576. By February 2013, plaintiff appeared "stable at baseline," despite having "rapid, pressured speech and racing thoughts." AR at 569. Accordingly, Mancuso assigned plaintiff a GAF score of 66. Id.

On April 16, 2012, Mancuso completed a medical statement on behalf of plaintiff for the Monroe County Department of Human Services. AR at 544-547. Plaintiff's main complaints were depression, anxiety, chronic pain, and dysregulated mood. AR at 544. Mancuso stated that plaintiff's symptoms had improved through her use of "coping skills to prevent decompensation," but noted that her anxiety and mood dysregulation persisted. AR at 545. Mancuso opined that plaintiff's symptoms resulted in frequently lost employment, frequent difficulty completing educational or training programs, and frequent interference with her daily activities. Id. Occasionally, Mancuso opined,

---

Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, IV 34 (1994).

plaintiff's symptoms required hospitalization or visits to the emergency room, interfered with her ability to interact appropriately with others, interfered with her ability to abstain from drugs or alcohol, and caused decompensation. Id. Despite these episodes, Mancuso noted that plaintiff's mental status examination indicated that plaintiff was "alert and oriented x3, [that her] mood [was] anxious and elevated . . . [that her] speech [was] pressured with racing thoughts . . . [and that her] insight and judgment [were] fair." Id. In her employability determination, Mancuso opined that plaintiff was very limited[3] in her capacity to perform simple and complex tasks independently and in her capacity to maintain attention and concentration for rote tasks. AR at 546. Plaintiff was moderately limited[4] in her capacity to follow, understand, and remember simple instructions and directions; regularly attend to a routine and maintain a schedule; maintain basic standards of hygiene and grooming, and perform low stress and simple tasks. Id. Based on these symptoms and limitations, Mancuso opined that plaintiff suffered from "chronic and persistent symptoms of mood dysregulation and anxiety that impair[ed] [her] daily functioning." AR at 547. Her chronic mental impairments, pain,

---

[3] Meaning that plaintiff was unable to function twenty-five percent or more of the time. AR at 546.

[4] Meaning that plaintiff was unable to function ten to twenty-five percent of the time. Id.

and physical impairments, Mancuso determined, rendered her permanently disabled with no expectation of improvement. Id.

On February 20, 2013, Mancuso and Dr. Dawood wrote a letter to plaintiff's counsel verifying plaintiff's ongoing and active outpatient mental health treatment that started in January 2010. AR at 567. They described plaintiff's bipolar-disorder-related symptoms as including poor memory and concentration, labile mood, racing thoughts, rapid and pressured speech, poor sleep, anxiety, and periods of emotional deregulation. Id. They concluded that these symptoms significantly impacted her daily and social functioning "with episodes of mania and depression that result[ed] in [an] inability to maintain [a] consistent work schedule and function effectively in a work setting." Accordingly, Mancuso and Dr. Dawood concluded that plaintiff "[did] not demonstrate ability to work at this time." Id.

Mancuso and Dr. Dawood jointly prepared a Mental Residual Functional Capacity Assessment for plaintiff on February 25, 2013. AR at 647-648. They opined that plaintiff had severe[5] limitations in her ability to understand or remember detailed instructions; maintain attention and concentration for at least two straight hours on at least four occasions in a workday; sustain an ordinary routine without special supervision; work

[5] A severe limitation "indicates that the activity is totally precluded on a sustained basis and would result in failing even after short duration." AR at 647.

near or with others without becoming distracted; and get along with others without distracting them. AR at 647. Plaintiff demonstrated moderately severe[6] limitations in her ability to understand and remember short or simple instructions; interact appropriately with the public or customers; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to unexpected changes in work setting and routine; and set goals or make plans on her own. AR at 647-648. According to the assessment, plaintiff demonstrated only moderate[7] limitations in her ability to remember locations and procedures; make simple work-related decisions; ask questions or ask for help from supervisors; maintain appropriate behavior, neatness, and cleanliness; respond to expected changes in work setting and routine; and travel in unfamiliar settings and use public transportation. AR at 647-648. Mancuso and Dr. Dawood opined that workplace-related stressors - attendance requirements, production demands, and demanding customers - would increase the severity of plaintiff's impairments. AR at 648. Even an entry-level job with simple, routine, and repetitive tasks, they concluded, would increase plaintiff's

---

[6] Moderately severe limitations suggests that "the activity is not totally precluded but is substantially impaired . . . and can only be engaged in occasionally or seldom during an eight hour day." AR at 647.

[7] Moderate limitations suggest that "the activity is somewhat impaired . . . but can be engaged in occasionally to frequently . . . but not constantly or continuously." Id.

psychological symptoms. Id.

Psychiatric Consultative Examination Reports: Plaintiff was examined by Dr. Christine Ransom, Ph.D., on April 19, 2011. AR at 344-349. In her Psychological and Intellectual Assessment for Determination of Employability, Dr. Ransom reiterated plaintiff's mental health complaints, noting that she suffered from "mood swings and hyperactivity," difficulty sleeping, crying spells, feelings of anxiety and irritability, and excessive energy. AR at 344. Dr. Ransom found that plaintiff frequently experienced job loss or failed to complete educational or training programs as a result of her symptoms, and that her behavior frequently interfered with her activities of daily living. AR at 345. Dr. Ransom also opined that plaintiff's psychiatric symptoms occasionally interfered with her ability to interact appropriately with others. Id.

On examination, plaintiff appeared abnormal and moderately labile in mood and affect, as well as abnormal and moderately impaired in her attention, concentration, and recent and remote memory skills. AR at 345-346. Her thought process, cognitive function, and insight and judgment, however, were normal. AR at 345-346. Dr. Ransom diagnosed plaintiff with moderate bipolar disorder and mild to moderate anxiety disorder. AR at 347. She also assigned plaintiff a GAF score of 65. Id. In her employability determination, Dr. Ransom opined that plaintiff

was moderately limited[8] in her ability to follow, understand, and remember simple instructions or directions; perform complex tasks independently; maintain attention and concentration for rote tasks; and complete low stress and simple tasks. Id. Plaintiff maintained normal functioning[9] in her ability to regularly attend to a routine and maintain a schedule; maintain basic standards of hygiene and grooming; and use public transportation. Id. Despite these observations, Dr. Ransom concluded that plaintiff would be unable to participate in activities other than her psychiatric treatment for six months due to the severity of her symptoms, which included: sleep and appetite disturbances, irritability, concentration difficulties, excessive energy, difficulty organizing activity, and excessive and obsessive goal oriented activity. AR at 348.

In addition to the consultative examination conducted by Dr. Ransom, consultative examiner Dr. Christina Caldwell, Psy.D., completed a psychiatric evaluation of plaintiff on July 22, 2011. AR at 472-475. Plaintiff reported difficulty sleeping, increased appetite, dysphoric mood, crying spells, social withdrawal, loss of interests, fatigue, excessive apprehension, and weekly panic attacks that induced dizziness,

---

[8] Meaning that plaintiff was unable to function fifty percent of the time. AR at 347.

[9] Meaning that plaintiff displayed no indication of a limitation. Id.

breathing difficulties, and sweating. AR at 472-73. On examination, plaintiff's mood was dysthymic and her voice was pressured and stammering. AR at 473. She appeared cooperative and had adequate presentation, and her judgment and insight were fair. AR at 473-474. Dr. Caldwell found that plaintiff could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently." AR at 474. According to Dr. Caldwell, plaintiff was limited in her ability to make appropriate decisions and was unable to relate adequately with others or deal with stress appropriately. Id. Dr. Caldwell diagnosed plaintiff with major depressive disorder with psychotic features, anxiety disorder, and panic disorder with agoraphobia. AR at 475. She concluded that plaintiff's prognosis was fair and that she should continue treatment. Id.

On August 5, 2011, T. Harding, Medical Consultant, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment of plaintiff. AR at 100, 482. On the Psychiatric Review Technique form, Dr. Harding confirmed that plaintiff suffered from major depressive disorder with psychotic features, anxiety disorder, and panic disorder with agoraphobia. AR at 485, 487. Dr. Harding opined that plaintiff demonstrated moderate limitations in her ability to

maintain social functioning, concentration, persistence, or pace. AR at 492. Plaintiff also demonstrated mild limitations in completing activities of daily living, but never had repeated episodes of deterioration of extended duration. Id. In the Mental Residual Functional Capacity Assessment, Dr. Harding noted that plaintiff appeared moderately limited in her ability to work with others without becoming distracted; complete a normal workday and workweek without interruptions from her symptoms; maintain a consistent pace without resting; accept instructions and respond to criticism from supervisors; get along with coworkers or others without distracting them; and set independent, realistic goals. AR at 100-101. In all other areas, Dr. Harding found that plaintiff was not significantly limited. AR at 100-101. Accordingly, Dr. Harding concluded that plaintiff had "the capacity to perform simple work." AR at 102.

**Hearing Testimony**

Testimony of Plaintiff: On June 26, 2013, plaintiff appeared before ALJ Susan Wakshul with counsel. AR at 45-90. Plaintiff's counsel spoke first, arguing that plaintiff lacked the residual functional capacity ("RFC") to perform substantial gainful activity and that her condition met listing 12.04 for affective disorders. AR at 49. He asserted that, because of

plaintiff's depression, she had "marked difficulties in concentration, persistence and pace, as well as maintaining social functioning." Id. Plaintiff then testified, stating that she had two daughters, but lived by herself. AR at 52-53. She did not have a driver's license and used Medicab to attend her doctor's appointments. AR at 53-54. Plaintiff stated that she completed eleventh grade in high school, but that she did not obtain a GED. AR at 54. Plaintiff testified that her last period of employment was in 2006, when she prepared and sold pizza at a gas station. AR at 55. She explained that she previously volunteered by cooking for the homeless, but that her carpal tunnel syndrome forced her to stop. AR at 56. Plaintiff also testified that, before she worked at the gas station, she volunteered at Highland Hospital, worked as a front desk clerk, and worked as a shift manager at Pizza Hut. AR at 56-58.

When asked why she was not currently working, plaintiff responded that her carpal tunnel syndrome, frozen shoulder, arthritis in her hip, and mental status prevented her from maintaining employment. AR at 59. She said that she was in constant pain and could barely care for herself. Id. Plaintiff testified that, for her mental impairments, she saw Dr. Dawood every three months and Mancuso every week or two weeks. AR at 61.

Plaintiff described her pain as concentrated on the left

side of her body. Id. She stated that she often felt her hip cracking and that her leg tingled down to her toes. Id. She described aching shoulder pain at all times, and noted that she had difficulty lifting her arm. AR at 67-68. Plaintiff also noted that she felt constant pain in her wrist, and that sudden movements and lifting increased the pain on her left side. Id. With respect to her mental impairments, plaintiff described her memory as "shattered," alleging that she frequently forgot to take her medicine and that "racing thoughts" made it difficult to concentrate. AR at 71-72. However, plaintiff stated that she could follow television shows because, typically, they were something that she was interested in. AR at 72. She also testified that she only socialized with her family and caregivers. Id. Plaintiff further testified that she experienced auditory hallucinations. Id.

According to her testimony, plaintiff's daily routine involved waking up, cooking breakfast, taking her medicine, trying to clean, watching television or spending time with her family, trying to cook dinner, and then getting ready for bed. AR at 73-74. If her children came over, they typically bathed her. AR at 74. Plaintiff stated that she only slept for three to four hours each night and that her sleep was "not very good." Id. Plaintiff testified that she did not do any cleaning or laundry, but that she did wash the small amount of dishes she

used. AR at 74-75. Plaintiff also stated that she rarely left her house to visit family members, but that she sometimes went for walks. AR at 75-76.

<u>Testimony of the Vocational Expert:</u> Vocational Expert ("VE") Diana Sims also testified at the hearing regarding plaintiff's record of employment. AR at 80. According to the VE, plaintiff's job as a fast food worker was unskilled and required light exertion; her job as a kitchen helper was unskilled and required medium exertion; her job as a front desk clerk was semi-skilled and required light exertion; her job as a sales associate at a gas station was unskilled and required light exertion; her job as a banquet server was semi-skilled and required light exertion; and her job as a shift manager at Pizza Hut was skilled or semi-skilled and required light exertion. AR at 81.

The ALJ then posed a series of hypothetical questions to the VE, first asking whether an individual with plaintiff's work experience could perform their past work if limited to: medium work; frequent fingering and handling; occasional overhead reaching with the left arm; simple, repetitive, and routine tasks; occasional interaction with others; minimal stress without production, pace, or work quotas; occasional changes in work setting; and occasional decision making and use of judgment. AR at 82. The VE testified that an individual with

those limitations could not perform plaintiff's past work. Id. However, the VE noted that such an individual could work as an assembler, finisher, or hand packer. AR at 82-83. With an added limitation of occasional exposure to environmental irritants, extremes in temperature, wetness, and humidity, the VE opined that such an individual could only work as an assembler or finisher. AR at 83.

Next, the ALJ asked if employment opportunities existed for an individual limited to: light work; occasionally climbing ramps and stairs; never climbing ropes, ladders and scaffolds; occasionally crouching, kneeling, crawling; frequently balancing and stooping; frequently handling and fingering; occasionally reaching overhead with the left upper extremity; simple, routine and repetitive tasks, meaning unskilled work; occasional and superficial interaction with others; low stress, defined as no production pace work or quotas, occasional decision making, and occasional exposure to environmental irritants, extremes in temperature, wetness and humidity. AR at 83-84. The VE found that such an individual could work as an unskilled office helper, an unskilled final assembler, and an unskilled porter. AR at 84. With an additional limitation of only occasional handling and fingering with the left upper extremity, the individual could work as a machine operator or a machine tender. AR at 84-85. If the individual was limited to sitting and

standing as needed, the VE testified that they would be unable to maintain competitive employment. AR at 85-86. The VE noted that the only position at a sedentary level with these limitations was a surveillance monitor position. AR at 87. The VE also indicated that if the individual would have more than twelve to fifteen absences per year, or was not productive at least eighty-five percent of the time, no competitive employment opportunities would exist for them. AR at 87-88.

**Determining Disability Under the Social Security Act**

The Evaluation Process: The Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1. The Commissioner considers whether the

> claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical

findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: On July 3, 2013, the ALJ denied plaintiff's application for supplemental security income. AR at 24-39. In applying the five-step sequential evaluation, the ALJ first found that plaintiff had not engaged in substantial gainful activity since June 6, 2011, the date of her application. AR at 29. At the second step, the ALJ found that plaintiff had the following severe impairments: carpal tunnel syndrome, left ulnar neuropathy, major depressive disorder, anxiety, panic disorder, diverticulitis, degenerative joint disease of the left shoulder and left hip, diabetes, emphysema, and bipolar disorder. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations and, as a result, proceeded to assign plaintiff an

RFC. AR at 31-37. The ALJ concluded that plaintiff had the RFC

> to perform light work as defined in 20 CFR 416.967(b) except occasionally climb ramps or stairs and never climb ladders, ropes and scaffolds. She is limited to occasional kneeling, crouching, crawling and frequent balancing or stooping. Moreover, she is capable of frequent handling and fingering and occasional overhead reaching with the left upper extremity. She needs a sit/stand option as needed and should experience only occasional exposure to environmental irritants, extremes in temperatures, wetness and humidity. She is limited to simple, repetitive tasks and occasional and superficial interaction with others. She is also limited to low stress work, which is defined as no strict production paced work or quotas, occasional changes to work setting, occasional use of judgment and decision making.

AR at 31.

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the RFC to perform her past work, notwithstanding her severe impairments. AR at 37. The ALJ concluded that the exertional and non-exertional requirements of plaintiff's past work exceeded her RFC and that she was unable to perform her past relevant work. Id. The ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age, education, and previous work experience. AR at 37-38. The ALJ next determined whether jobs existed in the national economy that a person having plaintiff's qualifications and RFC could perform. AR at 38; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.969, 416.969(a).

After assessing plaintiff's job qualifications, the ALJ determined that she could work as an office helper or final assembler. AR at 38.

**Standard of Review**

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir.), cert. denied, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation

marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied

correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Though plaintiff raises three arguments in her motion,[10] they can be distilled into two primary challenges: (1) that the ALJ erred in evaluating the opinion evidence from plaintiff's treating physician and (2) that the error was not harmless because the ALJ's RFC determination was flawed. See Docket # 10-1 at 19-29.

Treating Physician's Opinion: Plaintiff first argues that the ALJ failed to provide satisfactory reasons for her decision to apply "no weight" to the opinion evidence from plaintiff's treating physician, Dr. Dawood. Id. at 19-25. Similarly,

[10] Plaintiff argues that: (1) "the ALJ erred in evaluating the opinion evidence of record," (2) "the ALJ's failure to accord proper weight to the treating source opinions was not harmless error," and (3) "the ALJ erred in formulating hypothetical questions to the vocational expert." See Docket # 10-1 at 19-29. At base, however, plaintiff is objecting to the ALJ's application of the treating physician rule and its result on her subsequent RFC determination. Indeed, plaintiff argues that the ALJ's questions to the VE were improper *because* the RFC was incorrectly determined. Id. at 27-29.

plaintiff argues that the ALJ should have assigned some weight to the opinions of Gavett and Mancuso. See id. While acknowledging that Gavett and Mancuso are not "acceptable medical sources" entitled to controlling weight, plaintiff contends that their opinions should have been afforded some weight to show the severity of her symptoms. See id., see also 20 C.F.R. § 416.913(a). Plaintiff concludes that their opinions are consistent with the record as a whole, and argues that the ALJ's explanations for assigning them less than controlling weight, including that plaintiff's treatment notes and GAF scores demonstrate her improvement, lack support from substantial evidence. See Docket # 10-1 at 19-25.

In response, the Commissioner argues that the ALJ properly afforded no weight to the opinions of Dr. Dawood, Gavett, and Mancuso because they are inconsistent with the record as a whole, and because Gavett and Mancuso are "other sources" not entitled to controlling weight. Docket # 13-1 at 11-17. Additionally, the Commissioner contends that the consultative opinions of Dr. Caldwell and Dr. Harding, as well as plaintiff's demonstrated improvement through treatment, contradict the opinion evidence from Dr. Dawood, Gavett, and Mancuso. Id. at 14-16. Finally, the Commissioner argues that the ALJ's reliance on plaintiff's GAF scores to show improvement was permissible because the ALJ declined to equate the GAF scores with a

functional capacity assessment. Id. at 17.

Analysis: Under the treating physician rule, an ALJ must afford "a measure of deference to the medical opinion of a claimant's treating physician." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); 20 C.F.R. § 404.1527(d)(2). Accordingly, the opinion of a claimant's treating physician as to the nature and severity of claimant's impairment is given "controlling weight," so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)); see also, Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)). "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." Burgess, 537 F.3d at 128 (internal citations and quotations omitted).

Relatedly, the Social Security Administration is required to explain the weight that it gives to the opinions of treating physicians. 20 C.F.R. § 404.1527(d)(2) ("[W]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). This is true even when the treating source's opinion is given controlling

weight, but especially true if the opinion is not given controlling weight. See Burgess, 537 F.3d at 129. The ALJ must explicitly consider, inter alia, the "[l]ength of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Id (internal quotations omitted) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)); see also Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). "After considering the above factors, the ALJ must comprehensively set forth [their] reasons for the weight assigned to a treating physician's opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (citing Burgess, 537 F.3d at 129). The failure to provide "good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[T]he Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

An ALJ "may also use evidence from other sources," such as a therapist, to evaluate the severity of a claimant's impairment

and the impairment's impact on a claimant's ability to work. 20 C.F.R. § 416.913(d)(1); see also Beckers v. Colvin, 38 F. Supp. 3d 362, 371 (W.D.N.Y. 2014) (holding that opinions of nurse practitioners, while non-acceptable medical source opinions, can be used to show the severity of a claimant's impairments). Moreover, while non-acceptable medical source opinions are not automatically entitled to the same weight as treating source opinions, they "are entitled to 'some extra consideration' when the [non-acceptable medical source] has a treating relationship with the patient." Id. (quoting Mongeur, 722 F.2d at 1039, n.2). In fact, a report produced by an "other source" is eligible for treating source deference when it is reviewed and approved by a treating physician. See id. at 372; see also Griffin v. Colvin, 2016 WL 912164, at *14 (D. Conn. Mar. 7, 2016) ("The Mental Impairment Questionnaire completed by [a licensed therapist] was co-signed by [the treating psychiatrist]. This is important, and it is a fact that the ALJ did not consider."); McAninch v. Astrue, 2011 WL 4744411, at *15 (W.D.N.Y. Oct. 6, 2011) ("There is no legal principle which states that a doctor must personally write out a report that he or she signs in order for it to be accorded controlling weight."); Keith v. Astrue, 553 F. Supp. 2d 291, 301 (W.D.N.Y. 2008) (instructing ALJ to evaluate notes produced by a social worker and signed by a psychiatrist "in accordance with the

treating physician rule"). Indeed, there is no reason for an ALJ to believe that a report prepared by someone other than a treating physician, but nevertheless reviewed and signed by that treating physician, does not reflect the treating physician's own view. Santiago v. Barnhart, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006) ("[T]here is no reason to believe that the report [the treating physician] signed does not reflect his own view. Nor is there any legal principle which states that a doctor must personally write out a report that he signs for it to be afforded weight.").

Here, the parties do not dispute that Dr. Dawood was plaintiff's treating physician. See Docket #10-1 at 21-23; see also Docket # 13-1 at 12. Accordingly, and contrary to the ALJ's assertion, see Docket # 13-1 at 12, 16-17, the functional reports produced and signed by plaintiff's therapists and Dr. Dawood constitute proper treating source opinions. Thus, Dr. Dawood, in conjunction with plaintiff's therapists, Gavett and Mancuso, offered two treating source opinions about plaintiff's functional abilities. AR at 514-519, 647-648. In one opinion, Dr. Dawood and Gavett opined that plaintiff would have: moderate impairment in restrictions of daily activities; marked impairment in receiving and carrying out instructions, communicating, and receiving constructive criticism; and marked impairment in maintaining concentration, persistence, or pace.

AR at 515-516. In the other opinion, Dr. Dawood and Mancuso noted that plaintiff would have several severe impairments regarding understanding and memory, sustained concentration and persistence, and social interaction. AR at 647. They also indicated that a routine, repetitive, simple, entry-level job would increase plaintiff's symptoms, thereby serving as a stressor. AR at 648. The ALJ, however, gave "no weight" to these assessments, claiming that they were inconsistent with treatment records based on plaintiff's apparent improvement and were "overly pessimistic." AR at 36.

While the Commissioner is correct in arguing that an ALJ may properly discount a treating physician's opinion if it is inconsistent with other substantial evidence in the record, Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008), that simply isn't the case here. A review of the record establishes that nothing in Dr. Dawood's treatment notes or the treatment notes from Gavett and Mancuso indicate that their functional assessments of plaintiff are inconsistent or pessimistic. Although Dr. Dawood and the therapists noted on some occasions that plaintiff was doing better, appeared calm, or had a euthymic mood, she consistently displayed symptoms related to depression, anxiety, and bipolar disorder. AR at 583, 591, 600, 616, 626, 640. Indeed, in a letter dated February 20, 2013, well into plaintiff's treating relationship with Dr. Dawood, he

opined that plaintiff's ongoing difficulties with concentration, memory, anxiety, and emotional deregulation "significantly impair[ed] her daily and social functioning with episodic periods of mania and depression that result[ed] in her inability to maintain consistent work schedule and function effectively in a work setting." AR at 567. Dr. Dawood commented on plaintiff's treatment, noting that she was working towards developing coping skills and managing her medication, but nevertheless found that her symptoms persisted. Id. These observations were confirmed in plaintiff's most recent Mental Residual Functional Capacity Assessment, completed by Dr. Dawood and Mancuso in February 2013. In their assessment, plaintiff suffered from a range of severe limitations with respect to her concentration and persistence, and would be unable to work a routine, repetitive, simple, entry-level job without increasing her level of impairment. AR at 648. The fact that Dr. Dawood suggested, despite plaintiff's temperate improvements, that she was nonetheless severely restricted by her mental impairments and would suffer psychiatric harm working a routine and simple job should speak to the severity of plaintiff's impairments and not to any inconsistency in Dr. Dawood's opinion. Garcia v. Colvin, 2015 WL 7758533, at *10 (S.D.N.Y. Dec. 1, 2015) ("[E]vidence of improvement alone, without an assessment of how any such improvement reduced the claimant's functional

limitations such that they are no longer, or never were, marked limitations is insufficient. . . . One can show even significant relative improvement - but if the deficiency is sufficiently great, a marked limitation may remain." (citations omitted)). The ALJ's reference to plaintiff's ability (or inability) to use public transportation and her GAF scores, which do not "necessarily reveal a particular type of limitation and [are] not an assessment of claimant's ability to work," Camille v. Colvin, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015), also do little to cast doubt on the multiple and otherwise consistent reports, letters, and assessments provided by Dr. Dawood, Gavett, and Mancuso detailing plaintiff's severe and marked non-exertional limitations. See AR at 514-19, 544-47, 567, 647-48. Accordingly, the ALJ's decision to credit the opinions of one of plaintiff's consultative examiner and a state agency consultant over plaintiff's treating physician, several therapists, and plaintiff's other consultative examiner appears arbitrary. See Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."); see also Hensley v. Astrue, 573 F.3d 263, 267 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling

weight simply because another physician has reached a contrary conclusion."). Indeed, Dr. Dawood, through his long-standing treating relationship with plaintiff, had a far more reliable foundation on which to comment on plaintiff's limitations than an examiner from a single consultative appointment. At a minimum, though, the minor discrepancies over plaintiff's ability to use public transportation and inconclusive notes of improvement cited by the ALJ fail to qualify as substantial evidence to justify a wholesale rejection of the multiple treating source opinions. In these circumstances, remand is appropriate. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); see also see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

Harmless Error: Plaintiff next asserts that the ALJ's failure to properly consider the opinions provided by her treating physician and other examining sources rendered her RFC determination flawed. See Docket # 10-1 at 25-29. Plaintiff

believes that the ALJ's rejection of these opinions was more than mere harmless error; she claims that it was prejudicial and necessarily tainted the ALJ's subsequent analysis. Id. The Commissioner argues that the ALJ properly rejected the opinions of plaintiff's treating physician and other examining sources, and properly relied on the opinions of plaintiff's consultative examiners to assess her RFC. Docket # 13-1 at 21-23.

The Court agrees with plaintiff; the ALJ's failure to assign any weight to Dr. Dawood's treating source opinions was not harmless error. Had the ALJ properly considered and adopted Dr. Dawood's opinions, she would have likely rendered a different RFC assessment. For example, at various points in the opinions provided by Dr. Dawood, he and plaintiff's therapists opined that plaintiff's mental impairments prevented her from functioning independently outside of her home, AR at 517, that "even a minimal increase in mental demand or change in the environment" would cause her to decompensate, id., and that plaintiff suffered various severe limitations in her ability to maintain concentration and understand instructions. AR at 647. Most troublingly, Dr. Dawood opined that even a "routine, repetitive, simple, entry-level job" would increase plaintiff's psychologically-based symptoms. AR at 648. These non-exertional limitations are not encompassed in the ALJ's RFC assessment and, as demonstrated at oral argument before the ALJ,

would likely have precluded plaintiff from gainful employment. AR at 87 ("[I]f the individual is not productive at least [eighty-five] percent of the time it would not be consistent with competitive employment."). Accordingly, I find remand appropriate so that the ALJ may provide a more thorough explanation of her reasons for completely rejecting the opinions of Dr. Dawood, Gavett, and Mancuso in favor of the opinion provided by a one-time consultative examiner and a non-examining consultant.

## Conclusion

The Commissioner's motion for judgment on the pleadings (Docket # 13) is **denied**, and plaintiff's motion for judgment on the pleadings (Docket # 10) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 27, 2016
Rochester, New York